The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Neal. Good morning, Your Honors, and may it please the Court. The Air Board's permitting of the Buckingham Compressor Station should be vacated and remanded for both of the reasons raised in our brief. One, the Air Board's failure to consider electric motors to power the compressors, which I will address, and two, the Board's site suitability determination, which Mr. Mueller will take up in a moment. Turning to Issue 1, it's important to remember what's at stake. Union Hill is an historic, predominantly African-American community with high rates of respiratory illness. The compressor station's pollution would worsen those health problems, and yet the Board and DEQ, the state agencies, refused to consider electric motors to power those compressors, which would all but eliminate that harmful pollution. That refusal was contrary to their obligation to consider best-available control technology or BACT, the maximum degree of emission reduction from the compressor station. Now, the only reason given for this refusal was one conclusory sentence in DEQ's response to public comments, where they said electric motors would constitute, quote, and is not considered. That's at JA-2178. What was the Board's reasoning given for not considering electric motors in this case? Your Honor, in this instance, the Board adopted into its decision at paragraph 2 of the decision statement the response to public comments, and the only place, that's the only reason given. So we can attribute to the Board this decision as well. Did the Board not also indicate that it was in compliance with the federal law in this area, and because it was in compliance with the federal law which required these things, that it was in compliance also? Your Honor, if by that you're referring to their saying that it was in compliance with national air quality standards, BACT is an independent requirement that is overlaid on top of the national air quality standards, and so a blanket statement that they are in compliance with federal law wouldn't cure this error. Well, are they in compliance with federal law, number one, and number two, does federal law apply? Your Honor, that's a great question. They are not in compliance with the Virginia-specific regulations for BACT, which are incorporated into their SIP and therefore are federally enforceable. Again, the question of whether or not they're in compliance with the national air quality standards is just a totally separate question. Now, whether or not federal law applies is a place where I think the state agencies have given us a moving target. On appeal, they say that EPA's redefining the source doctrine is irrelevant. In any cases, interpreting that doctrine are irrelevant, even though they use that same term of art to make their decision as the only basis for their decision. But, you know, electric motors, that's not new technology, so why should we find they're required now if they've not been required as BACT in the past? Your Honor, BACT is a case-by-case analysis, and it requires that the agency consider the maximum achievable emissions reductions for the stationary source. The fact that it's not a new technology actually helps our case because it shows that existing compressor stations make use of this technology to all but eliminate air pollution from compressor stations. So electricity produces no emissions. Gas, by definition, does. So you're saying it's always required? Your Honor, again, it's a case-by-case determination. Why wouldn't it be always required, I should say, because it produces no emissions? Well, Your Honor, in this instance, what is the error of the Air Board and DEQ was not considering it at all. There are other steps in the BACT analysis that they didn't even get to about, again, whether or not it would be required in this instance. We think a full and fair consideration would show that it would be appropriate in this instance. Again, getting back to Judge Thacker, your question, they've never said how this apparently Virginia-specific redefining the source doctrine would differ from EPA's, and they've never provided any guidance of their own, and they haven't shown any consistent prior application of a Virginia-specific redefining the source doctrine. Given that, we're presented, again, with a moving target and post hoc rationalizations for the decision. But under any scenario, it was arbitrary and capricious because they didn't give a reasoned basis for the decision. One conclusory sentence is not a reasoned explanation. A cogent explanation is a basic requirement of administrative law. It's much like the conclusory decision rejected by this court in Sierra Club versus Department of Interior, holding that the National Park Service's one sentence decision that was, quote, not accompanied by any explanation, end quote, was insufficient. And again, important to this issue about whether or not they're always required, part of the moving target here is that they were not consistent in how they treated the source. Virginia regulations define BACT as applying to the stationary source, which is the compressor station. And sometimes the state agencies agreed that that was the focus. For example, at JA2177-78, they declined to consider emissions reductions achieved by gas turbines to generate electricity because they restrict their view to compressor stations. But without explanation, later on the same page, they say the source is only gas turbines, and they refused to consider emissions reductions achieved at compressor stations that use electric motors. Again, they've said that they've compared this facility to other similar Virginia facilities, which would include Atlantic's lead partner Dominion's Loudoun County compressor station, which uses electric motors. And they also said they looked at similar projects across the country. And it is hard to imagine a more similar project than another compressor station along the Atlantic Coast pipeline. And in the permit application for the West Virginia compressor station at Mockingbird Hill, Atlantic itself characterized electric motors as an available control technology option in its BACT review. Second, getting back to this issue of whether or not EPA guidance governs, the state agencies have been inconsistent on this point as well. Their statement that it's irrelevant is at odds with their previous statement that they, quote, followed a similar but slightly modified version of EPA's approach to their BACT review. They never say how they modified EPA's approach, but no matter how far they stretch the word slightly, it would be unreasonable to modify EPA's approach in a way that would provide less protection to the people of Union Hill. And under EPA's approach, it was arbitrary not to consider electric motors. It has two steps. First, define the purpose of the facility. And second, take a hard look at those design changes that would reduce or eliminate emissions without changing that purpose. Here, the state agencies didn't even do that first step. They never looked at the definition of the source. No, you go ahead. They didn't engage in the fact that even the federal law did apply. That's right, Your Honor. Under the record. It was a conclusory one-sentence explanation, or lack of explanation, just a decision. And the purpose of the compressor station is to provide compression to support the transport of natural gas. Is that right? That's what they said in their permit application. Yes, Your Honor. Consistently, that's what they said in their application. And as the applicant itself knows, electric motors are an available technology that can reduce or eliminate emissions from the compressor stations without changing that stated purpose. So by just saying redefining the source without explanation, the state agencies have essentially rendered a decision in a black box. And the only available guidance is what EPA has provided and is relevant to this decision. Thank you, Your Honor. Mr. Mueller is now going to take up the site suitability. Good morning, Your Honors. John Mueller for the Chesapeake Bay Foundation. It is the Air Board's job to protect the 200 mostly African-American people living in Union Hill from air pollution and from unequal treatment. To protect people like Virginia Woodson, a descendant of Taylor Harper, whose land sits adjacent to the compressor station site of Freed's Lake. What is the issue you are addressing here? Site suitability, Your Honor. Just site suitability, not the other factors under the statute, not health, that sort of thing? Well, site suitability factors that we were focusing on are two that are identified in Virginia Code 10.1-1307E. And there are four factors there that DEQ and the Air Board were required to consider. And I'll refer to those generally as site suitability. Two of those that are important. The first one being, consider the character and degree of injury to or interference with health or the reasonable use of property the compressor station will cause and the suitability of operating an industrial gas burning compressor station adjacent to the community of Union Hill. Now, numerous citizens provided information to the Board and DEQ about the composition of Union Hill and about the health impacts. Dr. Lakshmi Fiord presented results of a door-to-door study within Union Hill that established that 84 percent of the population is minority, predominantly African American, and established that a number of these individuals suffer from premature, excuse me, pre-existing health conditions that will be exacerbated by additional fine particulate matter pollution. And it's important to understand what fine particulate matter pollution is. This is referred to as PM2.5 in the brief. It's 20 times smaller than the diameter of a human hair that could get deep into the lung and for which EPA has found no lower bound. That is, there is no amount of additional PM2.5 exposure that avoids health risks. And we provided that information and our comments to the Board not once but twice through Dr. George Thurston, an NYU researcher who has spent his entire career studying human health impacts. So what did the Board fail to do? The Board essentially did state in general terms that the draft air permit requirements are designed to protect public health in accordance with state and federal regulations. They did two things. So what did they fail to do? They stated that it's in compliance with the federal regulations, which in turn encompass these very concerns you're talking about from their perspective. Yes, sir. And that's important to remember from their perspective. Because what they did wrong was first they relied on the Buckingham County Board of Supervisors decision to grant a special use permit, a zoning permit basically, in the face of their own regulation that says that they can't do that. That relying on that decision by a local lay Board of Supervisors for zoning decision does not suffice for site suitability analysis under the statute. The other thing they failed to do is to actually consider unequal health impacts. They rely exclusively on the national ambient air quality standards put forth by EPA. And they say that's going to protect everybody so there's no unequal harm. Everybody gets treated the same. But that's incorrect with respect to particulate matter because there is no lower limit for health impacts associated with PM 2.5 exposure. We provided evidence showing that for the 24-hour standard for the NACs that the community will suffer 21% increased risk of health impacts. And that for the annual standard they'll suffer 41% impacts. Now right there they've got a comparison that they need to make. They have the national standard, which they're relying on solely, and yet we have conclusive evidence. I mean, even EPA says this when they established the standard back in 2013, that there's no lower limit for PM 2.5 exposure. And we know from Divinion's own modeling that PM 2.5 levels, fine particulate matter levels, will be the highest in Union Hill than anywhere else in the state. And that when coupled with that, with the fact that people are African American predominantly, and that African Americans suffer more from fine particulate matter exposure from things like asthma and premature death, it's the board's job to undertake an analysis to determine whether the NACs actually is protective. The national standard is actually protective of human health. Is there a dispute insofar as the demographics of this area? There was a dispute in the record as far as the evidence. DEQ and Atlantic continue to rely on a desktop model of EPAs called the EJ screen that has caveats written all over it. Do not rely on this. It's just important as a screening tool. Local information is much better. Dr. Laxmey-Fjord's evidence is just that, yet they never resolve that difference. On the one hand, they say there is no minority population in Union Hill, and on the other we have evidence proving from actual going door to door and knocking on the doors and talking to people that in fact there is a minority community there and they suffer from preexisting health conditions. So in conclusion, Your Honor, as this Court found in the Sierra Club v. Department of Interior case, when an agency fails to resolve conflicting facts and looks at factors that are outside the scope of what the legislator told it to do, that is by definition arbitrary and capricious. Thank you, Your Honors. Thank you. Saccone. Good morning, Your Honors, and may it please the Court. Martine Saccone for the State Defendants. I'll start with the Best Available Control Technology Challenge and then move to the Site Suitability Section 1307E Challenge. With respect to the Best Available Control Technology, we agree with petitioners that the federal EPA doctrine does not apply in this case because this is a Virginia-specific minor source permit. And I think the real question here is what do the Virginia regulations require? The Virginia regulations are very clear. A backed analysis is done to ensure that the emissions that are released from an emissions unit are controlled to the best degree the Board deems possible. Are the Virginia requirements more stringent than the federal requirements? They are insofar as under the EPA, the broader Clean Air Act scheme, a Best Available Control Technology analysis is not required for a minor source permit. Virginia requires that analysis to be done for a minor source permit. But what it does not require, and this is key here, it does not require the Board or the agency to consider an alternate emissions unit. And I don't understand my friends to disagree with that at all. I don't think there's any place in their reply brief, which is really the only place in their arguments where they address Virginia's regulations. I do not understand them to disagree. Is there a Virginia redefining the source rule? What there is, Your Honor, is a Virginia regulation that does not require the Board to consider an alternate emissions unit. So is there a Virginia redefining the source doctrine? I think when the agency used that terminology, they were using it as a sort of shorthand, but they were not suggesting that the EPA doctrine applies. So no, there is not a Virginia redefining the source doctrine? There is not a specific doctrine for minor source permits that we would call the Virginia redefining the source doctrine. I mean, again, I don't want to focus too much on the semantic because, of course, the agency did use that. It was certainly used throughout the briefing in this case. It was used in the petitioner's brief, yes, and I think Atlantic refers to it as well. But I don't want to suggest that there's something in the regulations that refers to redefining the source. Because there's not. There's not, no. And the agency did not suggest that there was. And I think if you actually look at the comment that my friend was referring to, it's very clear as to what DEQ was saying there. The application for a best available technology review, excuse me, the application for BACT reviews the affected emissions unit that is part of the facility proposed by the applicant. DEQ has determined that wholesale replacement of a natural gas turbine, the affected emissions unit for an electric turbine, a completely different process unit with a different energy source, constitutes redefinition of the source and is not considered in Virginia's BACT determination. So the agency is very clear. They're talking about a Virginia regulation. And what they're saying is the emissions unit, the natural gas turbine, is the emissions unit in this particular stationary source and we are not required to consider a different emissions unit. And I don't think there's any dispute. In any sort of Virginia law, if you look at the source that's going to be used, no matter how hypothetically, how poor the emission studies show their function is, you never are required to look at an alternative source, never, under Virginia law. Your Honor, I'm not suggesting that it would not be appropriate under some aspect of the Virginia review to consider an alternative emissions unit. But my friend grounds this challenge exclusively in the best available control technology review. But the best available control technology review is not a review under which the agency considers an alternative emissions unit. It's looking to technology. It's looking at things like filters or reduction technologies. If you look at – But what if the Band-Aids don't work? If the Band-Aids – Wait a minute. Wait a minute. What if the Band-Aids don't work and they still don't meet the emission standards sought? At what point does Virginia require you to look at alternative sources? Your Honor, if the Band-Aids don't work, the agency is not permitted to grant the permit at all. So this is also very clear. So it's all or nothing then? It's not all or nothing. I think the – I suppose what you just said, if they don't meet it, just, you know, we don't do it. We don't look for something. Is it true that they use these sources, electric and other places in Virginia? It is, Your Honor. When I said it's not all or nothing, what I mean to say is it's not, you know, we close the door and there's never going to be any further conversation. What I'm suggesting is that if the emissions unit proposed by the source is – through the use of the best available technology, we cannot get it under the emission standards required by federal and state law, the answer is to deny the permit. The applicant may come back with another emissions unit. The applicant may come back and say, okay, we'll try it with an electric turbine, and I'm not suggesting that it wouldn't be appropriate for the agency to have that conversation. What I'm saying is that the best available control technology is a specific review that looks at things like filters, scrubbers, ways to reduce the emissions coming out of that unit. But essentially, the agency is not in the business of telling Atlantic or another applicant how to compress gas. And this is exactly what the agency said in response to this comment. We are in the business of trying to make sure that the emissions units they propose are consistent with federal and state guidelines. And then there is a separate conversation to be had about whether it is appropriate to grant the permit, notwithstanding those limitations. And I agree with my friend who says on page 45 of his brief, the agency is not required to grant a permit even when it does meet the federal standards. My only point is the backed analysis is a specific thing. And if I could give you an example, I think it's sort of common life. When you turn on your tap and water comes out, there's going to be chemicals in that water that we may not want to drink. A control technology would be a britter filter. But you wouldn't say to someone who says, you know, make your water as clean as possible using the best available control technology. You wouldn't say to someone, go and buy bottled water, which is essentially what my friends are suggesting here. And to take the second point, which is that it wasn't explained properly in the regulation, in the administrative process. I disagree with that. I think what I'm telling this court today about how the agency declined to consider what is essentially a separate admissions unit is exactly what DEQ said in response to this comment. And they also were very clear that they were not looking to federal law. And that's at footnote 16 on the same page in their response to comments. Turning to site suitability, Your Honor, I think you're absolutely correct. The board is required to consider the factors listed in Section 1307E. They are not required to make specific factual findings. But in this case, they absolutely grappled with the issues that my friends are discussing. And I think it's telling because what my friend here said was that there were two errors. First, that they improperly relied on the zoning board. Second, that is not only untrue based on the board's specific consideration of this permit. Not DEQ. I agree that early in the permitting process, DEQ had a more limited understanding of site suitability that did rely heavily on the county's permit. But the board clearly rejected that. Specifically to what Virginia, the Virginia code requires here, as far as the board's duties. Yes. And it's set out very specifically. And you say zoning requirements is something they can rely upon. And simply say generally we complied by issuing, getting a zoning permit. And that in and of itself was sufficient. No, Your Honor. I'm not suggesting that. And the board didn't do that. It is a requirement, a prerequisite before the board can grant a permit that it must have, that the county must have agreed and granted a special use permit. But I do not agree that it is sufficient for the board to rely on the county's grant of a special use permit in its site suitability review. And that is not what the board did. The statute itself requires more than that. It requires you to consider the facts and circumstances relevant to the reasonableness of the activity, such as the character and degree of the injury and interference with health and safety. That's right, Your Honor. And the board did exactly that. How was that done by the board? That was done throughout this process. First, I think when. I understand that. But I want to know specifically what did the board articulate to indicate they did that? Your Honor, several of the board members made statements immediately before they voted. And to take an issue that comes up in the reply brief, I do not think it would be appropriate for this court to focus only on the written statement,  But tell me about that. That's an interesting proposition. You're saying the individual statements, we should consider that to be the consensus of the board, if individuals make a statement? Your Honor, what I'm saying is this is not like a federal APA case where the agency just Answer that question. I think here it is relevant to consider the individual statements of the board. It is relevant, but tell me in terms of where is it that when you have a board and you have just individual members making a statement, that when we review it, we consider that statement as part of a consensus that the board made? Or is it the written statement that's made? Your Honor, the written statement is a summary. It's a summary of the actions the board took at its meeting. But the challenged action is granting the permit. And that decision, that action was taken in a public meeting. So I think to ignore the statements that the board members made immediately before they voted on the permit is sort of to turn a blind eye to what this record clearly shows. And as Your Honor points out, Tell me about something that we can actually see then. Tell us about where is it that the board talked about the character and degree of the injury? Your Honor, for example, my friend talked a lot about fine particulate matter. If you look to JA-2924 to JA-2933, the chairman of the board went through a lengthy conversation about his particular analysis of particulate matter to the microgram. He actually considered not just what DEQ provided and not just the evidence in the record from Dr. Fjord's survey, which was certainly a huge part of the board's consideration. He looked to medical journals. He looked to other reports to determine that, as he described it, where the residents of this community live, the increase in fine particulate matter would be one microgram per cubic meter. So to that level of detail, the chairman describes his own consideration of site suitability and environmental justice. He is not alone. Several other board members made similar statements. And I think if you look sort of writ large across the way this permit was addressed, the board was not satisfied at the initial presentation in November that these issues had been considered. They recognized the importance of environmental justice. They recognized the importance of understanding the demographics of this community and the impact the compressor station would have. And they sent the matter back so they could think further about it. DEQ came back and did a further presentation. Additional information was provided to include the door-to-door survey that my friend talks about. So the board adopted much of the DEQ's analysis here. What did it mean when it said it declined to adopt any legal view expressed by DEQ regarding the board's authority under this Virginia Code? Your Honor, initially at the November meeting, DEQ presented a fairly limited understanding of site suitability that did rely heavily on the special use permit. DEQ's concerns were about how state law sort of – I think DEQ's concerns were about not stepping on the toes of the zoning board. Which part of that tells us which part of the analysis it was rejecting? Your Honor, if you look to page – sorry, about 2340 to 2350, this is where the board talks about why they're deferring consideration of the permit. And they talk about how there were some limitations of DEQ's understanding of its own authority. Which part it was rejecting? I think the best way to read – if we're looking just to the written statement, I think the best way to read that is it rejects any assessment that DEQ provided regarding its legal authority. And that would certainly include DEQ's limited understanding of site suitability. I think the board is trying to be clear there that insofar as DEQ is saying that we don't need to look to the demographics or we don't need to focus on things that the county zoning board may have already considered, the board is clearly rejecting that. The board is saying we do need to do that. So what did the board rely on in making its demographic and health risk determination? May I finish, Your Honor? Sure. Your Honor, what the board relied on was the information that DEQ and the public provided after the board sent the matter back to DEQ. I mean, I think they relied on – All of it? Yes, with respect to demographics. Because there are conflicting – there seem to be conflicting reports. So which one or ones did the board rely on? Your Honor, I think the best answer to that is the question of environmental justice has two steps. First, is there an environmental justice community? And second, is that community disproportionately impacted? And I think what the board did, and the chairman says this very clearly – Can you give me the answers to those two questions you just laid out? Yes. The chairman says this very clearly at JA-2924. I assumed that there is an environmental justice community here. And he's talking about an environmental justice community based on racial minorities because he talks about an EPA hotspot. So he says, I'm simplifying things. I assumed that. And I think that addresses the factual dispute in the record. You assumed it, and that suggests that he didn't know whether it was or not. It just said for the sake of argument. Well, yes, because there – These are people, so you're addressing human beings. Are we just going to assume it? Don't we know that there are people within 1.1 that ban? Don't you know the demographics? Your Honor, there is competing evidence in the record regarding the demographics. But isn't it interesting that you have to assume that. You have to assume who lives within 1.1 mile ban of the compressors. Shouldn't you know that? We are talking about some level of science, aren't we? We are, Your Honor, and I think it depends on the level of generality that you look to the population, and that's why – I just find it very telling that you just assume that, okay, for the sake of argument. This is not talking about just a legal argument. I'm talking about people who breathe and live in communities. I'm asking you now, do you concede that 84% to 85% of the people who live in the 1.1 ban of the compressor are people of color, predominantly African Americans? Do you concede that? Your Honor, I have no reason to doubt the validity of the Dorador study. So, yes, I would concede that. Okay. Do you agree that national metrics alone for ambient national standards won't address disparity necessarily? For example, if you said, well, compared to the air in this city, this area is doing pretty well. But don't we need to know what is it compared to other people in the county of Buckingham? National standards is sort of an apples and oranges disconnect, isn't it? Your Honor, to be clear, I think what the board did was consider the air that the community surrounding the compressor station was breathing as compared to Virginia, not compared to national standards. And with respect to – Virginia would include Fairfax, Richmond, Norfolk, right? It would, and – So you're saying compared to those cities in a conglomerate of a means ambient pollutants, they're doing pretty well in that part of Buckingham. What about other people in Buckingham? How does it compare to people that are not within the five-mile range? How does it – my point is environmental justice is dealing with the people who live here who are impacted by it, correct? Your Honor, that's correct, but when we consider disproportionate impact, there does have to be disproportionate as to whom and what the board did here. As the people who live in the county. I would think you'd start there, wouldn't you? Well, Your Honor, what the board did here was compare it to the state. And as far as this court's role in determining whether that was arbitrary and capricious, again, the section 1307E factors require consideration. We agree they require consideration of environmental justice. And I think it's apparent from this record that what the board did here was recognize the very real possibility that there is a racial minority environmental justice community affected by this compressor station. So they essentially went to step two. Again, this is clear in what the chairman described and other members as well. They went to step two to look to the disproportionate impact. And in doing that, they certainly did not rely on the national ambient air quality standards, which I agree with Your Honor, those are made to be safe for public health within a margin of safety. And they are also formatted in consideration of people with vulnerabilities, such as the elderly children and those with breathing problems. But even understanding those standards, the board was very clear and DEQ was very clear. They are well below the national ambient air quality standards. And looking to the state writ large, what DEQ and the board essentially looked at was to say, we start from a baseline where this community is breathing air that is cleaner than 90% of the state. Although there is an impact from this compressor station, the impact is marginal. It is slight because of the very stringent limitations put on this compressor station through the permitting process as well as the other permits that were required to be given before the state air board. Again, the question for this court is whether the board's decision was arbitrary. I think with respect to whether or not the board considered environmental justice, this record is replete with evidence that it did. Well, can you tell me this then? What is the delta between the air quality that would be impacted by a five-mile ban versus the air quality outside of that but inside of Buckingham County? Because that would be a good figure to know, wouldn't it? Your Honor, I don't know the answer to that. But that's the problem. Shouldn't you know that? Because we live in communities. We don't live in the whole state. The point is if you're going to have environmental justice, what's the key to justice? Fairness, isn't it? Right? So just hypothetically, hypothetically, what you're saying is that, all right, national standard is here. Okay. Your county is well below that. We're going to pollute a little bit hypothetically. I'm just using hypothetically. You're going to pollute a little bit. But in the end, you're still going to be under the national. You're going to be under Virginia. But you can't tell me how different are you going to be from your neighbors, the non-African American neighbors, for example. You don't even know that? Your Honor, I don't know the answer to that. But shouldn't you know that if you're going to tell me you have achieved environmental justice? Your Honor, again, the way that the board evaluated environmental justice and disproportionate impact was to look to the state as a whole. And I think the question for this court is whether, in doing so, in, again, considering the factors set out in Section 1307E, which includes site suitability, whether that decision was arbitrary. And I would submit that it was not. Again, the board considered this issue. The board heard from the public. It heard from the expert agency. It considered the health impacts. And I would urge this court to look to you. But you know it didn't consider what I just asked you because you can't answer here today as their counsel. That's right. I cannot answer that. Okay. Thank you, counsel. Thank you. Mr. Lin. Good morning. May it please the Court. My name is Albert Lin, and I represent the Intervenor Atlantic Coast Pipeline. If I may turn first to the fact question, I wanted to underscore something that the state's counsel said in response to Judge Thacker about redefining the source. It is, I think, a shorthand. This is with regard to the first issue dealing with the question of gas versus electric. Yes, Your Honor. Redefining the source is a shorthand that I think it's easy to get caught up in those words because I think it captures a common sense principle that underlies the backed analysis. The backed analysis, as this Court knows, is about looking at something, right, some source, some emitting source, and asking what are the other controls that could be put in place to reduce the emissions. So there's a threshold question there of what is the thing that we're looking at, right, to determine what the alternative technologies might be. And so I think there is a common sense principle in that you have to figure out what that thing is. There can't be a moving target, right, for the agency to assess the controls that you could apply to. And redefining the source from the regulations in Virginia really just captures the principle that it's the unit that's proposed by the applicant. Now the applicant, Chief Judge Gregory, as you were discussing with the state's advocate, the applicant bears that risk. If you propose something and the agency decides to reject it simply because they would rather you have proposed as an applicant something else, then that's the risk that you bear as the applicant. But I think that's really all that redefining the source is about, which is what do the regulations say is the unit that you look at as an agency to then determine what are the various available control technologies. And which regulation did the briefing use redefining the source as shorthand for? Which regulation is that shorthanding? There's a couple different regulations, which I know the state has cited. 580.1190, 5-80.1190 says, quote, a control technology review. There must be a control technology review to determine if the emission units will be designed, built, and equipped to comply with all applicable standards of performance. There's another one, 550-240, that says the affected facilities at stationary sources to which the provisions of this article apply, that includes BACT, are emission units. And there's actually – And where are those listed in the one-page permit? They are not listed in the permit. And how can we review the permit? Well, the permit has the statement that says that BACT for Article VI requires looking at emission units proposed by the facility. I think that's the statement by the agency of how they read the regulations. And there are actually publicly available – there's actually publicly available guidance that's on the Virginia Town Hall website, which has regulations and guidance from the Virginia government. And I've got two of them here, document APG-354 as well as APG-356. Again, those are both publicly available, and they talk about each affected emissions unit emitting a pollutant subject to permitting shall have BACT applied. So I don't think this notion is new, as our friends have suggested on the other side. I think this is the BACT analysis where, again, you have a common-sense notion that you have to have something that you start from, right, the baseline thing. That's something that Virginia has done for years and, again, is in publicly available guidance. Mr. Lim, may I ask you a question? I understand your position. I think you made it very clear. Just hypothetically, if the compressors were designed to operate on multiple sources, both gas and electric, but the proposal from those who have petitioned for a permit said, we're going to use gas. So you're saying you have, you meaning the government, the agency, has no authority to say, wait a minute, why don't you use electricity, because you would say that, no, you said it's gas, and we don't get into that because that's redefining a source. That's the way you would interpret it. Based on how you explain that, in my hypothetical, you would say, you could even say, turn on the part that allows electric, and they say, no, we only want gas. Is that right? That's the way you would say it, that would work? No, Your Honor, and I'm not an engineer, so your hypothetical, there may be some technology that can do that. That's obviously not the technology here. The turbine's here.  Right. No, I understand, Your Honor. But so my point was, if you do have something that could do different things, that might be a different process or method that could be applied. But that's, again, a different question of what would be the underlying source. So to answer your hypothetical, in that case, they couldn't say, you need to use a solar source turbine. If it's a turbine that does different things, we'd have a different question. Here we have a turbine that operates only on natural gas, and that's what the applicant proposed, and that's the risk that the applicant bears. If I could turn very quickly to the environmental justice concerns. Chief Judge Gregory, we hear what you're saying. You mean what I ask? You hear what I ask? Yes, yes, about the importance of environmental justice. And one thing I did want to stress is, we do think that more was done in this permit process to make sure that environmental justice concerns were heard. And this is for the company in particular, the General Counsel of Dominion. Speak to the scope of it. As I understand, this was done so that it would indicate whether there was a disproportionate, adverse impact on any resident of Virginia. Is that correct? And not, it wasn't specific to these residents. You know, it would seem that those who are closer to it, you would consider that somewhat a bit of a ways away from it. So explain that to me. I don't quite understand that. Yes, Your Honor. If I may. Yes, you may. I don't think that's quite accurate. I think the question of disproportionality. Which I think was not accurate. Of course, Your Honor. Is it not accurate that closer to it, you have more of an impact than if you were further away? That's not accurate? No, I think what DEQ did here, and if you look at JA- But I want to make sure what you're saying is not accurate. Is it not accurate that if you are closer to this gas turbine and living in this area, that you are more likely to be affected than, let's say, you were quite a ways away? You're down on the coast somewhere. No, that is accurate, Your Honor. What I was saying was the comparison that was made, as we read the record, was on what is the burden being placed on this community, and are they being asked to carry a greater burden in terms of air pollutants than the rest of the state? And I think that's why- Why not the rest of the county? I think that's a- The question of disproportionality is not well-developed in Virginia law, and I think, as the state's counsel said- But you used the word common sense a couple of times when you were explaining about the source. Why not common sense here? It makes common sense if you're going to deal with justice. Justice ought to be applied where it's needed. I mean, okay, that's hypothetical. Your air is pretty good compared to Southern California. I don't live in Southern California. I want the same air that my neighbors who are 25 miles away in the same county. I want to breathe, too, so my lungs can feel what they feel. I don't want you to tell me this is pretty good compared to Southern California. I'm not picking on California, but the fire, I don't sense this. I'm talking just in terms of-because it's a big population. I don't mean to disperse California at all, but I mean the whole idea of smog. Everybody knows what smog is. But that would be a standard for justice? Well, it's pretty good compared to the whole of Virginia, but don't you want to know how it is compared to fellow Buckahamians? Or Buckahamians, how you would say it. Right? Yes, Your Honor, but I think-two answers, if I may. The first is when you're the state board, I think the question that the state board is facing, by sort of the nature of their jurisdiction is to look across the state and to ask themselves are they putting a greater burden on a particular community as compared to other communities in Virginia? I think that's the question that a statewide board is asking itself. I also think, you know, depending on how you draw your circles, whether it's for this case or another case, if you draw your circle small enough, there's always going to be a disproportionate impact because those who are closer to whatever the source is are always going to bear a greater burden than those who are just slightly farther away. And so in some ways that's a standard that could never be satisfied. And so I think, again, sort of coming back to- And it never will be if you never measure it. Your Honor- Yeah, you never will. You know, it's like the Wizard of Oz, he said when he started in the Yellow Brick Road, he said, where do I go? He said, start from the beginning is always a good place to start. And it starts by measuring what is applicable to environmental justice. I see your point, yeah, incrementalism, yeah, okay, somebody who's 1.3, 1.4, but the county is the oldest subdivision of the state, and counties have special laws in Virginia. I know I'm a Virginia lawyer, you know, that kind of autonomy. That's not an arbitrary border to start from. Your fellow county members, how does your error compare to them? And that does not get into this ad nauseum incrementalism that you suggest. I understand, Your Honor. I did want to stress something that hasn't come up is that as a result of our efforts in going out into the community and talking to people in their churches and in their living rooms and their restaurants, the permit was actually made stricter. One of the things that the individuals in the communities raised was a concern about continuous monitoring. This permit was already, based on the backed analysis, the strictest in the country for a compressor station of this type when the permit was proposed at the November meeting. Following that meeting, when the board raised questions about site suitability, they amended that proposed permit based on concerns we had heard when we had gone out into the community about continuous monitoring and added a continuous emissions monitoring system for NOx and other monitoring requirements. So I understand your point, Your Honor, and I don't mean to disagree with it, but I do think a lot was done here to hear the community and to try to make changes. But how do we know that, and how does the community know that without factual findings? As the State's counsel said, the final decision document refers to the parts of the record that the board relied on, and there's the discussion in the presentations at the board meetings about these amendments. They specifically say that these amendments have been added in response to concerns raised by the community. That's what makes it difficult. We are bound by the board's explanation of its reasoning, but as I understand what you and your co-counsel are saying, is that that reason can arise from a single statement of amendment or just a discussion that was had during that period. You don't rely upon summary stuff, but you do rely upon when, for instance, the board adopts certain documents, like the one in October 2018 that is the only one I saw that discussed EJ. So it's difficult to determine what is the reasoning that we use here, and when we do that, I mean, what happens when a board member says something that's not quite true? I mean, we talked about that with the zoning and the other matters they brought up. You didn't quite want to follow that because it was a single member. Yes, Your Honor, and I think it, and I'm sorry, I've gone way over my time, but if I can answer your question, I think part of this gets to the difference between how these state citizen boards make their decisions. What we see here, this final decision statement, is not uncommon. This is the way that state air permits are issued, and we've attached to our brief a decision from the Circuit Court of Richmond that upheld a statement very similar to this, that relied for some of its reasoning on slides that were part of the record. And similarly here, there's discussion, there's presentations, there's statements by the board members. These are citizen board members who are required to issue their concise statement contemporaneously with their decision. It's not a federal rulemaking where you've got a whole staff and a really long time to articulate in depth the reasons for the decision. Thank you, Your Honor. Thank you, counsel. Mr. Neal, you have some time reserved. Thank you, Your Honor. First, going to this question of whether or not there is a Virginia-specific doctrine, remarkably there's a disagreement between the applicant here, Atlantic, and apparently from my colleague representing the state agencies who said that there's not a You're talking about redefining the source document? Yes, Your Honor. In their brief, Atlantic said it was a Virginia-specific redefining the source doctrine, and now counsel for the state agencies have said no, there's not a specific doctrine, it's just shorthand. Now, and again, turning to their That goes back to your moving target argument in your opening. I can't quite follow it either. Yes, Your Honor, and post hoc rationalization to justify the decision. My colleague for Atlantic cited some publicly available guidance that I don't believe was cited in any briefs, but I can assure you that I have not found any public guidance that refers to a redefining the source doctrine under Virginia regulations. It's a term of art, redefining the source. It came from the EPA, and it's just axiomatic that if you care about redefining the source, you have to first define the source. And Atlantic did so here. They defined the source in such a way that just to provide compression, to move gas down the pipeline, that would make electric motors completely consistent with that definition of the source and allow electric motors to reduce emissions from the facility. Now, there was a lot of discussion about how this is the strictest permit for a compressor station, and I just want to emphasize that that claim might hold true for compressor stations that use gas turbines. But back-review is supposed to look at technology, not just other permits. And if we look at the harmful fine particle pollution that Mr. Mueller addressed, it's a perfect example of the hollowness of their claim about this being the strictest permit. Their claim to bragging rights here just ignores that electric motors would have removed the fine particle pollution. And if you look at the permit limits, they're essentially the same here for fine particle pollution as the uncontrolled emissions limits for fine particle pollution. They did not identify an available control technology for that pollution because they ignored electric motors. Now, your honors, my colleague from the state agencies indicated that they grappled with these site suitability factors. And I would just return us to the decision statement. And in paragraph two of the decision statement, the board said specifically what they relied on to make their decision. The only parts of that decision that referred to the health and site suitability factors came from the response to public comments from October of 2018 and the final permit analysis. And you'll see that that final permit analysis on site suitability at JA 1794, it existed in the same way back in the summer of 2018 as it did when it was signed by the board. And timing here is key. What that means is the only things that were incorporated into their decision related to site suitability had been set down by DEQ before the second comment period on environmental justice issues, before they had been told to go back and say, no, you can't just rely on zoning permits before any of that. And it's just unreasonable to say that given what the board has incorporated into their decision, we can go to individual comments of board members, sometimes cited in their brief, one of the board members who was removed and didn't take part in the final consideration, or just rely on one of the chairmen who said he went outside the record and looked at other things as somehow defending an administrative decision on these critical site suitability and health factors. And again, I think it's important to note when we say there's a dispute in the record, Atlantic itself said to the Air Board in January, right before the permit was issued, that there was no environmental justice community. And so that's part of why there's a conflict in this record and part of why the board needed to resolve that conflict and actually make a finding about the status of Union Hill and make a particular finding about how the pollution from this Buckingham Compressor Station would harm the people of Union Hill. If there's any other questions, I'd be happy to address them, but I see my time has expired. Thank you, counsel. Thank you, Your Honor. All right. We'll come down to Greek Counsel and go to our next case. �
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker